CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
July 07, 2025
LAURA A. AUSTIN, CLERK
BY: s/A. Beeson
     DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| **CHRISTIAN THOMAS NEALSON,** ) | |
| Plaintiff, ) | Case No. 7:23-cv-00071 |
| ) | |
| v. ) | |
| ) | By: Michael F. Urbanski |
| **T. BLANKENSHIP and T. NORVELL,** ) | Senior United States District Judge |
| Defendants. ) | |

## MEMORANDUM OPINION

Christian Thomas Nealson, a state inmate proceeding pro se, filed this civil action under 42 U.S.C. § 1983 against two correctional officers at Keen Mountain Correctional Center (KMCC), T. Blankenship and T. Norvell. Nealson alleges that the defendants physically abused him, forced him into a shower without shoes, and placed him in solitary confinement because he refused to answer the officers' questions. He claims that the defendants' actions violated his rights under the First, Fifth, and Eighth Amendments to the United States Constitution.

The case is presently before the court on the parties' cross-motions for summary judgment. ECF Nos. 75 and 86. For the reasons set forth below, Nealson's motion is **DENIED**, and the defendants' motion is **GRANTED IN PART AND DENIED IN PART**.

### I.  Background

**A.  Nealson's Verified Amended Complaint**

The events giving rise to this action occurred on the night of October 8, 2022. Am. Compl. Attach. 2, ECF No. 18-2. In Claim 1, Nealson alleges that he was charged with the

disciplinary offense of disobeying an order after he refused to answer the defendants' questions. Am. Compl. Attach. 1, ECF No. 18-1, at 1. Nealson told both defendants that he had "the right not to speak or answer anything they ask or say." Id. He claims that he "was taken to solitary confinement for exercising [his] First and Fifth Amendment right[s]." Id.

In Claim 2, Nealson asserts that he "was forced barefoot into the shower" to be strip searched after being taken to solitary confinement. Id. He alleges that inmates are known to "do disgusting acts in shower stalls," such as masturbating, urinating, and defecating, and that forcing him into the shower without shoes exposed him to infectious diseases, bacteria, and germs. Id. He claims that he has "the right to be protected from diseases" and that the defendants "knowingly and willingly violated [his] rights." Id. at 1–2.

In Claim 3, Nealson alleges that Blankenship and Norvell "physically abused" him when he "exercised his right to remain silent." Id. at 2. He asserts that he was "kneed multiple times" by both officers "when [he] made it known [he] was exercising [his] rights." Id.

**B.    Defendants' Evidence**

In support of their motion for summary judgment, the defendants submitted copies of three reports that Blankenship submitted in the early morning hours of October 9, 2022: an internal incident report, a disciplinary offense report charging Nealson with the offense of disobeying an order, and a disciplinary offense report charging Nealson with using vulgar or insolent language toward an employee. J. Harrison Aff. Encls. A, B, C, ECF No. 59-1.

According to the incident report, Blankenship and Norvell responded to the B-3 pod at approximately 11:00 p.m. on October 8, 2022, after being notified that one of the inmates in cell B-336 was refusing to follow orders to remove an item from his cell door window. J.

2

Harrison Aff. Encl. A at 1. Upon their arrival, "Officer Damron once again ordered the inmate to remove the item from his cell door window to which he again refused and yelled 'Fuck you bitch. I ain't got to take shit down.'" Id. The officers subsequently opened the cell door and removed both inmates from the cell. Id. "The inmate that was being belligerent towards staff was asked which bunk and locker belonged to him." Id. In response, the inmate said, "I don't have to tell you shit." Id. (internal quotation marks omitted). Blankenship then "ordered the inmate to give his name and state number and to advise which bunk belonged to him." Id. The inmate responded, "Fuck you bitch, what are you going to do if I don't." Id. (internal quotation marks omitted). The inmate was ordered to turn to be restrained, and a handcuff was placed on his left hand. Id. The report indicates that "[h]ands on techniques were used to turn the inmate to restrain the inmate's right hand" after he "refused to comply with orders to be restrained." Id. "The inmate was then ordered to kneel for leg restraints to be applied." Id. When the inmate refused to comply with that order, "[h]ands on techniques were again used to assist the inmate into a kneeling position." Id.

After the restraints were successfully applied, the inmate was escorted to the restorative housing unit (RHU),* placed in a shower, and "strip searched without incident." Id. The inmate continued to refuse to identify himself and said, "Fuck you all." Id. (internal quotation marks omitted). The report indicates that the inmate was eventually identified as "inmate C. Nealson 1519593" and that Nealson would be charged with disciplinary infractions as a result of the incident. Id.

---

* The defendants note that "[t]he former 'solitary confinement' is now known as Restorative Housing (RHU) Status." Defs.' Br. Supp. Mot. Summ. J., ECF No. 59, at 1 n1.

In Disciplinary Case No. KMCC-2022-1705, Nealson was charged with disobeying an order in violation of Virginia Department of Corrections (VDOC) Offense Code 201A. The disciplinary offense report includes the following description of the offense:

> On October 8, 2022 starting at approximately 11:00 p.m. inmate C. Nealson 1519593 was given a multitude of direct orders to identify himself to staff with his name and state number. The majority of these orders were recorded via handheld camera. Inmate Nealson refused to identify himself to each direct order. Staff subsequently had to utilize other means to identify the inmate after his multiple refusals of direct orders to identify himself. Inmate Nealson is being charged per OP 861.1.

J. Harrison Aff. Encl. B at 1.

In Disciplinary Case No. KMCC-2022-1704, Nealson was charged with using vulgar or insolent language toward an employee in violation of VDOC Offense Code 222. The disciplinary offense report describes the offense conduct as follows:

> On October 8, 2022 at approximately 11:00 p.m. Lieutenant T. Blankenship [asked] inmate C. Nealson 1519593 . . . which bunk and locker belonged to him. Inmate Nealson then stated "Fuck you bitch, what are you going to do if I don't. Sergeant T. Norvell and Officer N. Damron were present at this time and witnessed the statement. Inmate is being charged per OP 861.1.

J. Harrison Aff. Encl. C at 1.

C.  **Nealson's Response**

In response to the defendants' motion for summary judgment, Nealson concedes that he refused to answer the defendants' questions and that he said, "I don't have to tell you shit." Pl.'s Resp. to Defs.' Mot. Summ. J., ECF No. 109, at 2. Although he acknowledges that this statement was "untasteful," he maintains that it was "completely accurate" because he "has the right to not answer officers' questions." Id. at 2–3. He asks that the court consider

handheld camera footage produced during discovery, and he asserts that the footage shows that he "was not combative or hostile towards officers." Id. at 3.

Nealson also contends that the internal incident report submitted by the defendants confirms that they used force against him even after he was placed in handcuffs, although he notes that the report does not specify what "hands on techniques" were used by the officers. Id. at 7–8. Nealson emphasizes that he "still wishes to receive video footage from the pod camera from 10/8/2022 [at approximately] 11:00 p.m. that proves that [he] was not aggressive at all and was placed in handcuffs without any problem and while in handcuffs standing up the defendants both kneed him." Id. at 8. He contends that "it was unnecessary to strike the plaintiff at all" and that "video footage would show that [he] was not combative and disruptive or aggressive." Id.

### D.  Available Video Footage

By order entered April 7, 2025, the defendants were directed to produce the surveillance and handheld camera footage requested by Nealson. ECF No. 117. In response, defense counsel advised that the VDOC "does not have any retained surveillance video that is responsive to the Plaintiff's allegations" but "does have in its possession two videos retained from handheld video cameras regarding the incident on October 8, 2022." ECF No. 119 at 2. Nealson acknowledged having the opportunity to watch those videos and, at his request, the defendants submitted them for the court to consider in deciding the pending motions. See Receipt/Acknowledgement, ECF No. 119-1, at 1.

One video, labeled MVI 1075, is approximately seven minutes long, and it shows Blankenship and another officer standing on either side of an inmate while he is sitting in a

5

chair in the B-3 pod. Blankenship identifies the time and date as 11:11 p.m. on October 8, 2022. He asks the inmate to state his name and number for the camera, and the inmate refuses to respond. Blankenship then notes that the inmate refused to walk while placed in mechanical restraints, that "hands on techniques" were used to assist him into a kneeling position to apply restraints, and that a wheelchair was being utilized because the inmate refused to walk down the stairs. Blankenship asks the inmate whether he is willing to walk to the RHU and be strip searched "per policy." The inmate remains silent and refuses to answer the questions. The officers then shift him to a nearby wheelchair and wheel him out of the unit. Blankenship asks the inmate again whether he is going to "follow orders to be unrestrained and strip searched per policy in RHU," and the inmate remains silent. After arriving at a what appears to be a shower in the RHU, Blankenship asks the inmate again whether he is willing to follow orders to be unrestrained and strip searched, and the inmate declines to respond. Blankenship and another officer walk the inmate into the shower, lock the shower door, and remove his restraints through an opening in the door. Although the inmate refuses to provide his name, emphasizing that he does not "have to tell [the officers] shit," he complies with directions to remove his clothes and shower shoes in order for a visible search of his person to be conducted.

    The second video, labeled MVI 1077, is approximately five minutes long, and it begins with Blankenship announcing the time and date as 11:35 p.m. on October 8, 2022. Blankenship reports that the SD card in the camera ran out of memory at the conclusion of the strip search and that, based on the inmate's refusal to follow orders and walk to the RHU, the inmate had been left in the shower until the officers retrieved another SD card to record

his removal from the shower. The inmate can be seeing wearing an orange jumpsuit and shoes as the officers reapply his hand and leg restraints through an opening in the shower door. The officers then escort him to a cell and remove his restraints without incident. At the conclusion of the video, Blankenship gives the inmate one final opportunity to provide his name and number, emphasizing that it is "an order." The inmate does not appear to respond.

## II.   Standard of Review

Both sides have moved for summary judgment. Under Rule 56 of the Federal Rules of Civil Procedure, the court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986)).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted). In considering each motion, "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Id. (internal quotation marks omitted). Ultimately, the court must determine "whether the evidence presents a sufficient disagreement to require

7

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251–52.

### III. Discussion

#### A. Retaliation

Nealson alleges that the defendants unlawfully retaliated against him for refusing to answer their questions, including their requests for his name and inmate number. See Am. Compl. Attach. 1 at 1 ("I stated to both Blankenship and Novell that I have the right to not speak or answer anything they ask or say."). He claims that he had the right to remain silent under the First and Fifth Amendments and that he was taken to solitary confinement and charged with disciplinary offenses for exercising his rights.

##### 1. First Amendment

The First Amendment protects not only the "right to free speech . . . , but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). "A First Amendment retaliation claim requires a plaintiff to show that (1) his 'speech was protected,' (2) 'the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech,' and (3) 'a causal relationship exists between [the plaintiff's] speech and the defendant's retaliatory action.'" Hodges v. Meletis, 109 F.4th 252, 262 (4th Cir. 2024) (quoting Suarez Corp. Indus., 202 F.3d at 686).

As a general rule, the freedom of speech protected by the First Amendment "includes both the right to speak freely and the right to refrain from speaking at all." Wooley v. Maynard, 430 U.S. 705 (1977). Although "[p]rison walls do not form a barrier separating prison inmates

8

from the protections of the Constitution," Turner v. Safley, 482 U.S. 78, 84 (1987), some constitutional rights are "inconsistent" with proper incarceration, id. at 95. "'This is because certain privileges and rights must necessarily be limited in the prison context' in order to ensure prison and prisoner safety and security.'" Lumumba v. Kiser, 116 F.4th 269, 278 (4th Cir. 2024) (quoting Johnson v. California, 543 U.S. 499, 510 (2005)). A prison inmate "retains those constitutional rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Turner, 482 U.S. at 95 (internal quotation marks and brackets omitted). The Supreme Court has recognized that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." Bell v. Wolfish, 441 U.S. 520, 547 (1979). "[I]f a prisoner violates a legitimate prison regulation, he is not engaged in protected conduct" under the First Amendment. Smith v. Mosley, 532 F.3d 1270, 1277 (11th Cir. 2008) (quoting Thaddeux-X v. Blatter, 175 F.3d 378, 395 (6th Cir. 1999)).

Here, it is undisputed that Nealson refused to provide his name and number when asked to do so by the defendants and told them that he didn't "have to tell [them] shit." Affording protection for such "insubordinate" conduct by an inmate "would be inconsistent with the inmate's status as a prisoner" and "with the legitimate penological objections of the corrections system." Smith, 532 F.3d at 1278; see also Caffey v. Maue, 679 F. App'x 487, 490–91 (7th Cir. 2017) (holding that an inmates' insubordinate comment directed at prison guards "as a challenge to their authority" was not protected speech); Kervin v. Barnes, 787 F.3d 833, 835 (7th Cir. 2015) (emphasizing that "backtalk by prison inmates to guards, like other speech

9

that violates prison discipline, is not constitutionally protected"); Huff v. Mahon, 312 F. App'x 530, 532 (4th Cir. 2009) (affirming the district court's decision that "[a]n inmate does not have a First Amendment right to direct disrespectful comments to a prison official, whether verbally or in writing, because the prison's legitimate penological interests in promoting order and discipline . . . clearly necessitate the prohibition of such comments"). Additionally, to the extent that Nealson was ordered to provide his name and number and he refused to do so, his disobedience violated VDOC Offense Code 201, which prohibits inmates from disobeying an order. This prohibition is reasonably related to the VDOC's legitimate penological interests in maintaining order and discipline. See Lumumba, 116 F.4th at 282 (recognizing that "promot[ing] order, discipline, and security in the Virginia prison system . . . are legitimate penological interests"); see also Holleman v. Penfold, 501 F. App'x 577, 579 (7th Cir. 2013) (concluding that an inmate's "confrontational approach in opposing the guards' actions and disobeying orders to lock up was inconsistent with the guards' legitimate penological interests in maintaining order and discipline"). "As the court in Thaddeux-X stated, 'if a prisoner violates a legitimate prisoner regulation, he is not engaged in protected conduct, and cannot proceed beyond step one.'" Smith, 532 F.3d at 1277 (additional quotation marks omitted) (quoting Thaddeux-X, 175 F.3d at 395).

For these reasons, the court concludes that Nealson's refusal to answer the defendants' questions was not protected by the First Amendment and, thus, that he is unable to satisfy the first element of a claim for First Amendment retaliation. The defendants' motion for summary judgment will be granted as to this claim, and Nealson's motion will be denied.

### 2. Fifth Amendment

Nealson also claims that the defendants violated his Fifth Amendment right to remain silent by punishing him for refusing to answer their questions. "The Fifth Amendment, in relevant part, provides that no person 'shall be compelled in any criminal case to be a witness against himself.'" Minnesota v. Murphy, 465 U.S. 420, 426 (1984) (quoting U.S. Const. amend. V). "It has long been held that this prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" Id. (quoting Lefkowitz v. Turley, 414 U.S. 70, 77 (1973)). However, the Supreme Court "has insisted that the 'constitutional guarantee is only that the witness not be compelled to give self-incriminating testimony.'" McKune v. Lile, 536 U.S. 24, 36 (2002) (quoting United v. Washington, 431 U.S. 181, 188 (1997)) (second emphasis added). Thus, "[t]o qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." Hiibel v. Sixth Judicial Dist. Ct., 542 U.S. 177, 189 (2004).

In this case, Nealson does not allege that any of the information he refused to provide was "incriminating" for purposes of the Fifth Amendment. It appears from Nealson's filings that he refused to identify his name, inmate number, bunk, and locker merely based on the belief that he has "the right to not answer officers' questions." Pl.'s Resp. Defs.' Mot. Summ. J., ECF No. 109, at 3. "The Fifth Amendment, however, 'does not prevent prison authorities from civilly disciplining an inmate for refusing to answer questions where there is no possibility that the answers would be used against the inmate in a criminal proceeding.'" Fenwick v.

11

Hempfling, No. 4:22-cv-00159, 2023 WL 3012574, at *3 (W.D. Ky. Apr. 19, 2023) (quoting Bell v. Jumper, No. 4:21-cv-4056, 2021 WL 3260054, at *2 (C.D. Ill. July 28, 2021)). Because Nealson "does not explain how the disclosure [of the requested information] could have been used against him in a criminal case," he has no viable Fifth Amendment claim. Hiibel 542 U.S. at 189 (rejecting a Fifth Amendment challenge stemming from a petitioner's refusal to disclose his name). Accordingly, the defendants' motion for summary judgment will be granted as to this claim, and Nealson's motion will be denied.

**B.     Deliberate Indifference**

Nealson asserts two claims under the Eighth Amendment, the first of which is one for deliberate indifference to inmate health or safety. The claim is based on the fact that he was required to remove his shoes while being strip searched in the shower. Nealson alleges that inmates are known to perform "disgusting acts" in prison showers and that being "forced barefoot into the shower expose[d him] to countless infectious diseases, bacteria, and germs." Am. Compl. Attach. 1 at 1.

The Eighth Amendment's prohibition of cruel and unusual punishment "applies to claims by prisoners against corrections officials challenging conditions of confinement." Porter v. Clarke, 923 F.3d 348, 355 (4th Cir. 2019). However, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." Johnson v. Dellatifa, 357 F.3d 539, 546 (6th Cir. 2004) (quotation marks omitted). "Like any other Eighth Amendment claim, an Eighth Amendment conditions of confinement claim has (1) objective and (2) subjective components." Porter, 923 F.3d at 355 (internal quotation marks omitted). "Only extreme

12

deprivations are adequate to satisfy the objective component . . . ." De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003). "In order to demonstrate such an extreme deprivation, a prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions." Id. (internal quotation marks and citations omitted). And to satisfy the subjective component, a prisoner must show that a correctional official "knew of and disregarded an excessive risk to inmate health or safety." Danser v. Stansberry, 772 F.3d 340, 347 (4th Cir. 2014). In other words, deliberate indifference "requires proof that the prison official subjectively knew of the substantial risk of harm to a prisoner and consciously disregarded it." Ford v. Hooks, 108 F.4th 224, 229 (4th Cir. 2024) (internal quotation marks omitted). This is a "very high standard," which is not met by a showing of mere negligence. Id. at 230 (internal quotation marks omitted).

Applying these principles, the court concludes that the defendants are entitled to summary judgment on the claim of deliberate indifference. Nealson does not allege that he suffered any serious or significant injury as a result of having to take his shoes off to be strip searched in the shower. Nor has he produced any evidence from which a reasonable jury could find that he was exposed to a substantial risk of serious harm. Although Nealson alleges that it is generally "known that inmates masturbate, urinate, and in cases defecate in the shower stalls," Am. Compl. Attach. 1 at 1, he does not describe the state of the shower stall in which he was strip searched or allege that he was actually exposed to bodily fluids on the day in question. See, e.g., Lundsford v. Bennett, 17 F.3d 1574, 1577, 1580 (7th Cir. 1994) (rejecting an Eighth Amendment claim brought by inmates who were denied toilet paper, personal

13

hygiene items and cleaning supplies for about 24 hours, where the record contained "no evidence indicating that plaintiffs' cells were unusually dirty or unhealthy, or that health hazards existed").

Likewise, there is no evidence from which a reasonable jury could find that Blankenship or Novell actually knew of and disregarded an excessive risk to Nealson's health or safety. At most, Nealson suggests that the defendants are generally aware of inmates performing disgusting and unsanitary acts in prison showers. As appellate courts have recognized, however, "it takes 'more than a generalized awareness of risk to make out a deliberate-indifference claim.'" Owens v. Sec'y of Fla. Dept. of Corr., 812 F. App'x 861, 868 (11th Cir. 2020) (quoting Marbury v. Warden, 936 F.3d 1227, 1234 (11th Cir. 2019)); see also King v. Riley, 76 F.4th 259, 266 n.7 (4th Cir. 2023) ("We have specifically rejected the idea that knowledge of a general risk of violence in a prison unit can establish deliberate indifference."). Fourth Circuit precedent "makes clear that officials can be liable under the deliberate indifference standard only to the extent that they actually appreciated the risk factors in a given case, and only to the extent that they make the causal inference that the circumstances as they perceived them created a substantial risk of harm." Parrish v. Cleveland, 372 F.3d 294, 305 (4th Cir. 2004).

In short, Nealson has presented no evidence from which a reasonable jury could find that he faced a substantial risk of serious harm by having to take his shoes off in the shower stall in which he was strip searched or that the defendants actually knew of and disregarded an excessive risk to his health or safety. Accordingly, the defendants are entitled to summary

14

judgment on the Eighth Amendment claim of deliberate indifference, and Nealson's motion for summary judgment must be denied with respect to this claim.

**C.    Excessive Force**

Nealson's final claim is that the defendants used excessive force against him after he refused to answer their questions. The Eighth Amendment prohibits correctional officers from unnecessarily and wantonly inflicting pain on prisoners. Whitley v. Albers, 475 U.S. 312, 319 (1986). "An inmate's Eighth Amendment excessive force claim involves both an objective and a subjective component." Brooks v. Johnson, 924 F.3d 104, 112 (4th Cir. 2019). "The objective component asks whether the force applied was sufficiently serious to establish a cause of action." Id. "This is not a high bar; de minimis or trivial force is not enough, but anything more will suffice." Dean v. Jones, 984 F.3d 295, 302 (4th Cir. 2021).

The subjective component asks whether the correctional officer "acted with a sufficiently culpable state of mind." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). The state of mind required is "wantonness in the infliction of pain." Brooks, 924 F.3d at 112 (internal quotation marks omitted). "Whether an inmate can establish that impermissible motive turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Dean, 984 F.3d at 302 (quoting Whitley, 475 U.S. at 320–21).

The Fourth Circuit has explained that correctional officers "act in a good faith effort to maintain or restore discipline—that is, with a permissible motive—not only when they confront immediate risks to physical safety, but also when they attempt to preserve internal order by compelling compliance with prison rules and procedures." Brooks, 924 F.3d at 113

15

(internal quotation marks omitted). However, they "cross the line into an impermissible motive—using force maliciously and sadistically for the very purpose of causing harm—when they inflict pain not to induce compliance, but to punish an inmate for intransigence or to retaliate for insubordination." Id. (internal quotation marks omitted); see also Boone v. Stallings, 583 F. App'x 174, 177 (4th Cir. 2014) ("[T]he Eighth Amendment does not permit a correctional officer to respond to a misbehaving inmate in kind.").

The subjective component may be proved through direct or circumstantial evidence. Dean, 984 F.3d at 308–09. In Whitley, the Supreme Court identified four "non-exclusive factors" to assist in assessing whether an officer acted with a sufficiently culpable state of mind. Iko v. Shreve, 535 F.3d 225, 239 (4th Cir. 2008). Those are: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) 'any efforts made to temper the severity of a forceful response.'" Id. (quoting Whitley, 475 U.S. at 321). "If a reasonable jury could find, based on inferences drawn under the Whitley factors or other evidence, that [a correctional officer] used force maliciously to punish or retaliate against an inmate, then summary judgment is not appropriate." Dean, 984 F.3d at 302.

Having reviewed the record, the court finds that genuine factual disputes preclude an award of summary judgment to either side on Nealson's claim of excessive force. With respect to the objective component, the incident report submitted by the defendants indicates that unspecified "[h]ands on techniques" were used to restrain Nealson's right hand and to assist him into a kneeling position. J. Harrison Aff. Encl. A at 1. However, Nealson's verified

16

amended complaint indicates that he was "kneed multiple times" by both defendants. Am. Compl. at 2. Although Nealson does not claim to have suffered any serious injuries as a result of the defendants' actions, a reasonable jury could find from his sworn statements that the defendants used more than de minimis force. "So long as the force used is more than de minimis, the objective component is satisfied, regardless of the extent of the injury." Dean, 984 F.3d at 303; see also Poindexter v. Sandy, No. 21-6638, 2022 WL 1656126, at *4 (4th Cir. May 25, 2022) (concluding that officers exerted more than de minimis force against an inmate by kneeing him in the back of his left leg and taking him down to the floor).

Genuine issues of material fact also exist with respect to the subjective component. For instance, if, as Nealson contends, both defendants delivered knee strikes to his body after he was placed in handcuffs, a reasonable jury could question whether Nealson posed an immediate threat to the defendants' safety and whether the defendants used a disproportionate amount of force under the circumstances. See, e.g., Poindexter, 2022 WL 1656126, at *4 ("[E]ven assuming that Poindexter was tensing his arm [while being escorted], a reasonable juror could conclude that Diamond kneeing Poindexter twice in the back of his left leg, and Diamond and Jarvis together performing a takedown was disproportionate to the amount of force needed to ensure that Poindexter complied with the correctional officers' commands."). As the Fourth Circuit explained in Dean, "it is well-established . . . that officers may not use gratuitous force against a prisoner who has already been subdued . . . [or] incapacitated." Dean, 984 F.3d at 304 (alterations in original) (internal quotation marks omitted). "And when officers do use force . . . against a formerly recalcitrant inmate after he has been subdued, then

17

a reasonable jury may infer that the force was applied not for protective reasons but instead to retaliate or punish." Id. (emphasis in original).

Additionally, Nealson has identified "a potential impermissible motive" for the defendants to use more than de minimis force against him: that they were angered by his refusal to identify himself and "elected to retaliate by force." Poindexter, 2022 WL 1656126, at *5. Nealson concedes that he told the defendants that he didn't "have to tell them shit," and Blankenship cited the same insolent language in his incident report. Blankenship also noted that when asked to tell the officers which bunk and locker belonged to him, Nealson responded, "Fuck you bitch, what are you going to do if I don't." J. Harrison Aff. Encl. A at 1. As the Fourth Circuit observed in Brooks, a reasonable jury could take those statements into account in deciding whether the defendants used force in a good faith effort to induce Nealson's cooperation during the restraint process or "maliciously and in retaliation for his insubordination." Brooks, 924 F.3d at 116 (noting that an incident report included statements describing the prisoner's disrespectful attitude); see also Boone, 583 F. App'x at 176–77 (concluding that a reasonable jury could find that the amount of force used by officers was not justified if they accepted the plaintiff's allegations that the officers physically assaulted him "for some other reason than to maintain or restore discipline—for example, in retaliation for using vulgar language").

For these reasons, the court concludes that the evidence is not "so one-sided that one party must prevail as a matter of law" on the claim of excessive force. Anderson, 477 U.S. at 252. Accordingly, the motions for summary judgment will be denied with respect to this claim.

### IV. Conclusion

For the reasons stated, Nealson's motion for summary judgment, ECF No. 75, is **DENIED**, and the defendants' motion for summary judgment, ECF No. 86, is **GRANTED IN PART AND DENIED IN PART**. An appropriate order will be entered.

Entered: July 2, 2025

Michael F. Urbanski
U.S. District Judge
2025.07.02 17:32:48
-04'00'

Michael F. Urbanski
Senior United States District Judge